IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 24, 2001

## STATE OF TENNESSEE v. WILLIAM CASH PATE

**Appeal from the Circuit Court for Williamson County**
**No. 1-223-1098     Donald P. Harris, Judge and Cornelia Clark, Judge**

---

**No. M2000-02442-CCA-R3-CD - Filed June 27, 2001**

---

The Defendant, William Cash Pate, was convicted by a jury of second offense driving under the influence (DUI). In this appeal as of right, he argues that the trial court erred by failing to suppress the evidence obtained against him because that evidence was the fruit of his unlawful seizure at a roadblock. We agree. Accordingly, we reverse the Defendant's conviction and the trial court's order denying the Defendant's motion to suppress.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed**

DAVID H. WELLES, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

John Conners, Franklin, Tennessee, for the appellant, William Cash Pate.

Paul G. Summers, Attorney General and Reporter; Kim R. Helper, Assistant Attorney General; Ron Davis, District Attorney General; and Lee Dryer, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

On July 4, 1998, the Defendant and his wife were stopped at a roadblock located at the intersection of Carter's Creek Pike and Coleman Road in Williamson County. The roadblock was operated by three officers of the Tennessee Highway Patrol (THP). Sgt. Ronnie Strickland was the officer who stopped the Defendant's car, and he discovered that the Defendant had an open container of beer between his legs. The Defendant was instructed to pull over to the side of Coleman Road, because there was not a safe place to stop on Carter's Creek Pike. The Defendant was asked to perform three field sobriety tests, following which the Defendant was arrested and transported to the hospital to have a sample of blood drawn. The test results revealed that the Defendant had a blood alcohol concentration of .22 gram percent.

The Defendant moved to suppress the evidence obtained as a result of the roadblock on the ground that the roadblock was conducted in violation of the United States and Tennessee Constitutions. After a hearing, the trial court denied the Defendant's motion, and the case proceeded to trial, after which the Defendant was convicted. The Defendant again argues before this Court that the evidence should have been suppressed.

At the suppression hearing, Sgt. Strickland testified that the Tennessee Highway Patrol conducted an "enforcement roadblock" on July 4, 1998 between 9:00 p.m. and 10:00 p.m. He explained that an "enforcement roadblock" permits officers to check for driver's licenses, weight violations for commercial vehicles, and other violations as authorized by Department of Safety General Order 410. He stated that this roadblock was operated in compliance with General Order 410, which pertains to the operation of enforcement roadblocks. The requirements for an enforcement roadblock pursuant to General Order 410 are not as stringent as the requirements for a sobriety roadblock, which is governed by General Order 410-1.

Sgt. Strickland testified that he made the decision to establish the roadblock, which he was authorized to do by General Order 410. He did not discuss the decision with his supervisor, but he did notify "dispatch" that he was going to conduct the roadblock. He was the supervisor of the roadblock, and he made all the decisions regarding the operation of the roadblock, including the location, the timing, the duration, and which vehicles would be stopped. He said that the roadblock was located in a safe location, where the THP had previously conducted many roadblocks. It was at the T-intersection of Carter's Creek Pike and Coleman Road. Traffic on Carter's Creek Pike does not stop at the intersection, while traffic on Coleman Road does stop. The speed limit on Carter's Creek Pike at that location is 50 miles per hour. There are no streetlights at that intersection, and the area was dark on July 4. However, there were three patrol cars that had their blue lights flashing. The patrol cars were parked near each other off the roadway on the same side of Carter's Creek Pike. Sgt. Strickland testified that the visibility of the roadblock was excellent in all three directions. All three officers were in uniform, but Sgt. Strickland could not recall whether he was wearing a reflective vest. The Defendant and his wife both testified that Sgt. Strickland was not wearing a reflective vest.

Although there were three police cruisers with blue lights flashing and three officers in uniform, there were no other indications or warnings of the roadblock. There were no warning signs advising drivers of the roadblock, and there were no orange cones to help direct traffic. No advance notice was given to the media, but Sgt. Strickland testified that he could have notified the media. He chose not to do so, partly because notification was not required.

Sgt. Strickland testified that during the one hour duration of the roadblock, twenty-seven cars were stopped. Every car which entered the intersection was stopped. Five citations were issued, including two for DUI, one for an open container, and two for driving with a revoked or suspended license. Sgt. Strickland stated that the roadblock was not used as a subterfuge to search for drugs or drivers under the influence, despite the fact that it was conducted at night on Independence Day.

Both the Defendant and his wife testified that when they saw the blue lights, they believed there had been a traffic accident. They said that it was very dark at the intersection, and they did not see any police officers as they approached. There were no warning signs, orange cones, or officers in orange reflective vests. The Defendant slowed down as he approached the blue lights, but both he and his wife were startled when Sgt. Strickland suddenly appeared at his driver's side window. Both testified that they were frightened by the experience.

In her order denying the Defendant's motion to suppress, the trial judge specifically found that the roadblock was not conducted in compliance with General Order 410-1 or the supreme court's decision in State v. Downey, 945 S.W.2d 102 (Tenn. 1997), which govern sobriety roadblocks. However, she also found that the roadblock was conducted in compliance with General Order 410, governing enforcement roadblocks, and that the roadblock was not used as a pretext to search for drunk drivers. Accordingly, the trial judge determined that the Defendant's seizure was not unconstitutional, and she declined to suppress the evidence obtained against him.

> When reviewing the grant or denial of a motion to suppress,
> [q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. In other words, a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.

State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). However, the application of the law to the facts as found by the trial court is a question of law which the appellate court reviews de novo. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

Both the United States and Tennessee Constitutions protect against unreasonable searches and seizures. See U.S. Const. amend IV; Tenn. Const. art. 1, § 7. The intent and purpose of the prohibition against unreasonable searches and seizures found in the Tennessee Constitution has been found to be the same as that found in the Fourth Amendment to the Unites States Constitution. See State v. Simpson, 968 S.W.2d 776, 779 (Tenn. 1998). According to the Supreme Court, the purpose of this prohibition is to "safeguard the privacy and security of individuals against arbitrary invasions of government officials." Camara v. Municipal Court, 387 U.S. 523, 528 (1967).

Under both the United States and the Tennessee Constitutions, a search or seizure conducted without a warrant is presumed unreasonable. See Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971); Simpson, 968 S.W.2d at 780; State v. Watkins, 827 S.W.2d 293, 295 (Tenn. 1992). Therefore, evidence seized as a result of a search or seizure conducted without a warrant must be suppressed unless the State proves by a preponderance of the evidence that the search or seizure was

reasonable under the United States and Tennessee Constitutions. See Coolidge, 403 U.S. at 454-55; Simpson, 968 S.W.2d at 780; Watkins, 827 S.W.2d at 295.

The stop of an automobile and the detention of its occupants constitutes a seizure, even if the purpose of the stop is limited and the detention is brief. Whren v. United States, 517 U.S. 806, 809-10 (1996); Delaware v. Prouse, 440 U.S. 648, 663 (1979); Unites States v. Martinez-Fuerte, 428 U.S. 543, 556-58 (1976); State v. Vineyard, 958 S.W.2d 730, 734 (Tenn. 1997). Generally, for the seizure of an automobile to be reasonable, there must be some type of individualized suspicion of wrongdoing justifying the stop. See Whren, 517 U.S. at 810; Prouse, 440 U.S. at 655, 659; Vineyard, 958 S.W.2d at 734. In some circumstances, however, it may be considered reasonable under the United States and Tennessee Constitutions to seize an automobile and its occupants without any type of individualized suspicion. For example, in United States v. Martinez-Fuerte, the Supreme Court approved suspicionless seizures of automobiles at "permanent checkpoint" sites to search for illegal aliens, 428 U.S. at 556-57, and in Michigan v. Sitz, 496 U.S. 444 (1990), the Supreme Court approved suspicionless temporary checkpoints to search for intoxicated drivers. 496 U.S. at 450-55. The Supreme Court has maintained that "[t]he reasonableness of seizures that are less intrusive than a traditional arrest depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" Brown v. Texas, 443 U.S. 47, 50 (1979) (citations omitted). It has further explained that

> [c]onsideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.

Id. at 50-51. A key concern in balancing these interests is "to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field." Id. at 51. Thus,

> the Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers.

Id. (emphasis added). Accordingly, Fourth Amendment protection at checkpoint stops "lies in the appropriate limitations on the scope of the stop." Martinez-Fuerte, 428 U.S. at 567.

Our supreme court first addressed the constitutionality of roadblock checkpoints under the Tennessee Constitution in State v. Downey, 945 S.W.2d 102 (Tenn. 1997). In Downey, which analyzed the constitutionality of a sobriety checkpoint, our supreme court examined the United States Supreme Court cases addressing the constitutionality of roadblock seizures as well as cases from other states addressing the same issue. See id. at 106-10. The court adopted the three-part balancing test for determining the constitutionality of suspicionless seizures outlined by the Supreme Court in Brown and applied in Sitz as the appropriate constitutional standard under the Tennessee Constitution,

-4-

so that when a seizure occurs, an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field, and the seizure is carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers.

Id. at 110. Applying the Brown and Sitz test, the court recognized the State's "compelling interest" in detecting and deterring intoxicated drivers and asserted its conviction that roadblocks are effective tools in combating the drunk driving problem. Id. It also agreed with the Sitz court that the courts "should not determine which among reasonable law enforcement approaches is the most effective." Id. In light of these findings, the supreme court held "that the use of a sobriety roadblock may be used to advance the State's compelling interest provided it is established and operated in a manner that minimizes intrusion and limits discretion." Id.

In State v. Larry Allen Hicks, No. E1999-00957-CCA-R3-CD, 2000 WL 656801, at *6-7 (Tenn. Crim. App., Knoxville, May 19, 2000), perm. app. granted, (Tenn. Dec. 11, 2000), this Court considered the constitutionality of "driver's license" roadblocks. The roadblock at issue in that case was a roadblock established to check driver's licenses pursuant to General Order 410, which authorizes certain types of "enforcement roadblocks." See id. at *2. Using the balancing test set forth in Brown and Sitz and adopted by our supreme court in Downey, we determined that the State has a significant interest in regulating drivers and vehicles on the roadways and that roadblocks are an effective way to further that interest because they both detect and deter unlicensed drivers. Id. at *7. We thus concluded that

roadblocks to check for unlicensed drivers are constitutional under the United States and Tennessee Constitutions so long as they are "established and operated in accordance with predetermined guidelines and supervisory authority that minimize the risk of arbitrary intrusions on individuals and limit the discretion of law enforcement officers at the scene."

Id. (quoting Downey, 945 S.W.2d at 112).

While the roadblock at issue here involved more than just a check for driver's licenses, the same rationale applies. General Order 410 authorizes roadblocks to check for driver's licenses; commercial vehicle registrations, equipment, weight, and length; and agriculture violations where applicable: all of which involve the safe operation of vehicles on the highway. As we stated in Hicks, the State has a significant interest in regulating drivers and vehicles, thereby ensuring the safe operation of vehicles on the public highways of this State. See id. We believe that roadblocks are an effective way to further the State's interest because they detect and deter noncompliance with driver and vehicle regulations. See id. Thus, "enforcement roadblocks" established pursuant to General Order 410 and involving more than just a check for driver's licenses may be constitutionally permissible so long as they are "established and operated in accordance with predetermined guidelines and supervisory authority that minimize the risk of arbitrary intrusions on individuals and limit the discretion of law enforcement officers at the scene." Downey, 945 S.W.2d at 112. Accordingly, we must determine whether the roadblock at issue in this case met these requirements.

In denying the Defendant's motion to suppress, the trial court specifically determined that Downey was inapplicable to the instant case because Downey addressed sobriety checkpoints rather than enforcement checkpoints.[1] With this contention, we respectfully disagree. While the roadblock at issue before the Downey court was the constitutionality of a sobriety checkpoint, the same guidelines for determining whether a roadblock meets constitutional standards would apply to a roadblock of any type. See Larry Allen Hicks, 2000 WL 656801, at *6. No matter what type of roadblock is being conducted, the roadblock must still be "established and operated in accordance with predetermined guidelines and supervisory authority that minimize the risk of arbitrary intrusions on individuals and limit the discretion of law enforcement officers at the scene." Downey, 945 S.W.2d at 112. Thus, using Downey as guidance, we must determine whether that took place in this case.

As a framework for determining whether a roadblock minimizes intrusion and limits discretion, the supreme court in Downey adopted the criteria delineated in cases from Iowa, California, and Kansas. Id. at 110 (citing State v. Loyd, 530 N.W.2d 708 (Iowa 1995); Ingersoll v. Palmer, 743 P.2d 1299 (Cal. 1987); State v. Deskins, 673 P.2d 1174 (Kan. 1983)). Those criteria include: (1) supervisory authority which carefully targets the time and location of the roadblocks and establishes neutral procedures for their operation; (2) adequate warnings; (3) advance publicity; (4) minimizing the length and nature of detention; (5) adequate safety precautions; and (6) the availability of less intrusive methods for combating the problem. Id. After outlining these factors, the court also noted that a list of relevant factors "can take any length or form" and that "[n]ot every factor must weigh in favor of the state to uphold a given roadblock, nor is any single one dispositive of the issue." Id. It maintained that "the overriding question is whether the roadblock was established and operated in a constitutionally reasonable manner that minimized the intrusion on individuals and limited the discretion afforded to officers at the scene." Id.

The supreme court in Downey exemplified aspects of that roadblock which were consistent with constitutional standards. The discretion of the officers at the scene was limited because all cars traveling in both directions were stopped, and when the traffic became congested motorists were permitted to pass through the roadblock. Id. Also, safety measures were taken to warn approaching motorists, as the roadblock was set up in a safe and visible area and consisted of uniformed officers and marked patrol cars with flashing blue lights. Id. Nevertheless, after setting forth these aspects of the roadblock, the court determined that "[a]ll of the remaining evidence . . . indicated that this roadblock was not established and operated in a manner that was consistent with article I, section 7 of the Tennessee Constitution." Id. It explained as follows:

First and foremost, the decision to set up a roadblock was made by an officer in the field. Likewise, the site selected for the roadblock and the procedure to be used in operating the roadblock were matters left to the discretion of an officer in the field. No supervisory authority was sought or obtained, and no administrative decisions were made with regard to these critical factors. The State maintains on appeal that

---

[1]While concluding that Downey was inapplicable to this case because it dealt with sobriety checkpoints, the trial court also determined that had Downey been applicable, the requirements of Downey were not met in this case.

-6-

the absence of formal supervisory participation was of "little weight" since Lt. Hill supervised the roadblock at the scene. We disagree. Virtually every court has emphasized the importance of limiting the discretion of police officers at the scene. . . . Lt. Hill's concessions that supervisory and administrative authority was not sought makes it crystal clear that proper measures were not taken to prevent the unfettered discretion of officers at the scene.

The lack of administrative or supervisory decision making was also evidenced by the absence of publicity surrounding the roadblock. We believe advance publicity furthers the deterrence rational for the use of a sobriety roadblock. . . . The State's contention that advanced publicity was unnecessary because the roadblock was well-marked at the scene completely ignores the deterrence rationale. Accordingly, this omission in the present case likewise weighs against the reasonableness of the roadblock used to stop the defendant.

Finally, the absence of supervisory or administrative decision-making in this case may have contributed to creating an issue as to the purpose of the roadblock. The testimony in the record is that officers set up this roadblock for the purpose of checking drivers' licenses in accordance with General Order 410 of the Department of Safety. All the remaining evidence in the record, however, indicates that the actual purpose was the detection of alcohol-impaired motorists. We do not decide whether the roadblock was a "subterfuge" or a "pretext" for investigating drunk drivers, or address the implications that might follow such a finding. Instead, this discrepancy in the proof is a reflection of the overall failure by law enforcement officers to establish this roadblock in a manner consistent with administrative and supervisory oversight. We conclude, therefore, that this likewise is a factor that weighs against the reasonableness of this particular roadblock.

Id. at 110-11.

The State asserts that the roadblock in this case met constitutional standards because it was established and conducted in accordance with predetermined guidelines in the form of General Order 410.[2] While we agree with the State that the roadblock was established and conducted in accordance with General Order 410, that conclusion does not end our inquiry. Not only must we determine whether the roadblock as instituted was "established and operated in accordance with predetermined guidelines," we must determine whether the predetermined guidelines and supervisory authority "minimize the risk of arbitrary intrusions on individuals and limit the discretion of law enforcement officers at the scene." Downey, 945 S.W.2d at 112.

---

[2]We note that the State relies upon State v. Joe W. Steward, No. M1999-01284-CCA-R3-CD, 2000 WL 1246436 (Tenn. Crim. App., Nashville, Aug. 18, 2000) for its assertion that the roadblock was constitutional because it was conducted pursuant to General Order 410. In that case, a panel of this Court upheld the constitutionality of a roadblock that had been conducted pursuant to General Order 410. See id. at *2-4. However, based on the analysis and reasoning set forth in this opinion, we find the decision in Steward to be unpersuasive on the issue of the constitutionality of the seizure which occurred in this case.

-7-

In analyzing the roadblock in this case, we will utilize the procedure used in Downey and first identify the characteristics of the roadblock which are consistent with constitutional standards. As mandated by General Order 410, every pre-determined vehicle was stopped, which in this case was every vehicle. Thus, the discretion of the officers at the scene as to which vehicles to stop was limited. Also, safety measures were taken to warn motorists of the roadblock. Sgt. Strickland testified that the roadblock was in a safe and visible location, that it was marked by patrol cars with flashing blue lights, and that it was operated by uniformed law enforcement officers. These factors are all similar to factors found to be consistent with constitutional standards in Downey. See id. at 110.

Additionally, the trial court specifically found that this roadblock was not a subterfuge for other purposes, and the evidence does not preponderate against that finding. Accordingly, unlike Downey, an issue was not created as to the purpose of the roadblock, which would have contributed to a finding that the roadblock was not established "in a manner consistent with administrative and supervisory oversight." See id. at 111.

Nevertheless, like the situation in Downey, the decisions regarding whether to conduct the roadblock, when to conduct the roadblock, where to conduct the roadblock, and how to conduct the roadblock were left to an officer in the field -- Sgt. Strickland. According to General Order 410, lieutenants or sergeants may establish or approve roadblocks without seeking further administrative approval. The only requirement is that prior to conducting a roadblock, the departmental supervisor or senior member must notify dispatch that a roadblock is going to be conducted and inform dispatch of the type of roadblock, the location of the roadblock, the departmental members present, and any other agencies present. The State posits that because Sgt. Strickland was authorized under General Order 410 to establish this roadblock and make all decisions regarding its operation, the constitutional requirements were met. We do not agree.

In Downey, the supreme court placed great emphasis on the fact that these decisions were left to an officer in the field. See id. In that case, the officer establishing and supervising the roadblock was a lieutenant, which is a higher ranking officer than a sergeant. Notwithstanding, the supreme court rejected the State's argument that the roadblock satisfied constitutional standards because it was supervised by a ranking officer, stating, "Virtually every court has emphasized the importance of limiting the discretion of police officers at the scene. . . . Lt. Hill's concessions that supervisory and administrative authority was not sought makes it crystal clear that proper measures were not taken to prevent the unfettered discretion of officers at the scene." Id. at 110-11. The court quoted with approval the Pennsylvania Supreme Court, which asserted that the decision to hold a roadblock, "'as well as the decision as to its time and place, should be matters reserved for prior administrative approval, thus removing the determination of those matters from the discretion of police officers in the field.'" Id. at 111 (quoting Commonwealth v. Tarbert, 535 A.2d 1035, 1043 (Penn. 1987)). In Larry Allen Hicks, 2000 WL 656801, we upheld the constitutionality of the driver's license roadblock which had been established pursuant to General Order 410, but in that case the lieutenant conducting the roadblock had been ordered to set it up by his supervisor. See id. at *8. We distinguished that case from Downey, noting that

the fact that another officer, who was not at the scene, ordered the roadblock indicates that there was administrative and supervisory decision-making. This administrative and supervisory decision-making is completely opposite from the situation in Downey, where the decision to establish the roadblock was made by an officer in the field.

Id. Accordingly, we conclude, like the supreme court did in Downey, that due to the lack of prior administrative approval for the roadblock in the instant case, "proper measures were not taken to prevent the unfettered discretion of officers at the scene." Downey, 945 S.W.2d at 111.

In reaching this conclusion, we are not unaware of the practical difficulties that may arise when ranking officers with the authority to establish and approve roadblocks also work in the field. However, we believe that the supreme court has made it clear that an officer in the field may not arbitrarily decide to conduct a roadblock and decide how the roadblock is to be operated. This allows too much discretion to be exercised by an officer at the scene, regardless of his or her rank, resulting in an insufficient safeguard of a person's reasonable expectation of privacy. Therefore, these are matters for prior administrative approval, not the unfettered discretion of an officer in the field.[3]

Additionally, we note that there was no advance publicity regarding this roadblock. Sgt. Strickland testified that he had the discretion to inform the media in advance of the roadblock, but he chose not to do so because it was not required for an enforcement roadblock. Advance publicity is not required by or even mentioned in General Order 410, and the lack of publicity "is not, in and of itself, determinative" of whether a roadblock meets constitutional standards. See State v. Freddie Ray Guye, No. 01C01-9803-00141, 1999 WL 54805, at *2 (Tenn. Crim. App., Nashville, Feb. 8, 1999); Larry Allen Hicks, 2000 WL 656801, at *10. Nevertheless, the supreme court in Downey placed much emphasis on the lack of publicity in that case, stressing that "the presence or absence of publicity is a factor in assessing the reasonableness of the roadblock" and that the "absence of evidence in this record regarding the publicity or lack of publicity surrounding this roadblock . . . is indicative of the State's overall failure to show that this roadblock was established in accordance with supervisory and administrative standards." Downey, 945 S.W.2d at 111 n.8. Thus, while advance publicity is not required by General Order 410 and while the absence of publicity would not render a roadblock unconstitutional in every situation, it may be considered as another factor weighing against the reasonableness of this roadblock.

Accordingly, we hold that the roadblock at issue in this case resulted in an unreasonable seizure of the Defendant in violation of the Tennessee Constitution and our supreme court's decision in Downey. Because the decisions regarding whether to conduct the roadblock, when to conduct the

---

[3]We note that the Tennessee Department of Safety has addressed this issue in General Order 410-1, which governs sobriety checkpoints. Pursuant to that order, the location and time of all sobriety checkpoints must be approved by the Colonel, Deputy Commissioner, or a designated representative at least five days prior to conducting the checkpoint.

roadblock, where to conduct the roadblock, and how to conduct the roadblock were all made by an officer in the field, the roadblock was not "carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers," but was instead an "arbitrary invasion[] solely at the unfettered discretion of officers in the field." See id. at 110. Therefore, we reverse the Defendant's conviction and the trial court's order denying the motion to suppress, and we remand this case to the trial court for further proceedings consistent with this opinion.

_____
DAVID H. WELLES, JUDGE

-10-