# IN THE COURT OF APPEALS OF IOWA

No. 24-0157
Filed February 19, 2025

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**OCTAVIO LOPEZ SANCHEZ JR.,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Polk County, Celene Gogerty, Judge.


        A defendant appeals his sentences, arguing the district court abused its discretion by imposing consecutive sentences. **AFFIRMED.**



        Jane M. White of Boles Witosky & Stewart Law, Des Moines, for appellant.

        Brenna Bird, Attorney General, and Zachary Miller, Assistant Attorney General, for appellee.


        Considered by Tabor, C.J., and Ahlers and Sandy, JJ.

**SANDY, Judge.**

Octavio Lopez Sanchez participated in a drive-by shooting at a high school in Des Moines that resulted in the death of one student and critical injuries to two others. Lopez Sanchez pled guilty to one count of murder in the second degree in violation of Iowa Code section 707.3 (2024) and two counts of willful injury causing serious injury in violation of Iowa Code section 708.4(1). For his second-degree murder conviction, Lopez Sanchez received an indeterminate fifty-year sentence. For his dual convictions for willful injury causing serious injury, he received two indeterminate ten-year sentences. The district court ordered each of his sentences to run consecutively.

Lopez Sanchez now appeals, arguing the district court abused its discretion by imposing consecutive sentences. Finding no abuse of discretion, we affirm.

## I.      Background Facts and Proceeding Facts

On the afternoon of March 7, 2022, Lopez Sanchez and eleven friends drove to East High School in Des Moines looking for a fight. Lopez Sanchez and his friends had previously been involved in numerous altercations with several students at the school, including one that occurred the previous weekend at a party. The group drove in three separate vehicles. Lopez Sanchez was the driver of one of the vehicles. Six of Lopez Sanchez's friends were armed with handguns. Lopez Sanchez consistently denied carrying or shooting a firearm throughout this case. He was seventeen years old at this time.

Upon reaching the school, Lopez Sanchez and his friends circled the block several times in their vehicles. Eventually they spotted Jesus—one of the students they planned to confront—standing in the school parking lot with his younger

brother and several other students.  At some point, Jesus signaled to Lopez Sanchez and his friends to drive to an alley across the street from the school to fight.  Lopez Sanchez and his friends complied, and they drove into the alley and parked their vehicles at the end farthest from the school.  Several of Lopez Sanchez's friends exited the vehicles and stood waiting for Jesus to enter the alley.  But Lopez Sanchez remained in his vehicle.

A few moments later, Jesus, his younger brother, and three other students entered the alley.  As they entered the alley, Lopez Sanchez's friends quickly jumped into the vehicles.  Two of Lopez Sanchez's friends jumped in his vehicle.  Both were armed with handguns.  The vehicles then sped away from the alley.  After watching Lopez Sanchez and his friends drive off from the valley, Jesus and the others began to walk back to the school parking lot.

As they were crossing the street to get back to the school parking lot, the group noticed Lopez Sanchez's vehicle was driving towards them from the south.  When Lopez Sanchez's vehicle was even with them, his two passengers rolled down their windows and started to fire their handguns.  The group immediately dropped to the ground to avoid the rain of bullets being sprayed in their direction.  While they were on the ground, the other two vehicles carrying Lopez Sanchez's friends drove by and continued shooting at the group.  In total, Lopez Sanchez's friends fired forty-two rounds.

Jesus's younger brother was hit by one bullet, which punctured his heart and one of his lungs.  He passed away from these injuries shortly thereafter.  Another student who was with Jesus and his brother suffered a critical injury after being struck in her forehead by a bullet.  Additionally, one East High student—who

was sitting in her friend's vehicle in the school parking lot during the shooting—was struck in the head by a stray bullet.

Shortly after the shooting, police officers executed a search warrant at Lopez Sanchez's residence. The police recovered three nine-millimeter handguns from his bedroom. All forty-two shell casings recovered from scene of the shooting were nine-millimeter casings. Lopez Sanchez was arrested on March 8. He was charged by trial information with one count of murder in the first degree in violation of Iowa Code section 707.2(1), two counts of attempted murder in violation of Iowa Code section 707.11, and two counts of willful injury causing serious injury in violation of Iowa Code section 708.4(1). The State later amended the trial information to include a dangerous weapon sentencing enhancement for each count.

Because Lopez Sanchez was a juvenile at the time the offenses were committed, he filed a motion to transfer jurisdiction over his case to juvenile court. But this motion was denied by the district court. Lopez Sanchez subsequently entered into a plea agreement with the State under which he agreed to plead guilty to one count of murder in the second degree and two counts of willful injury causing serious injury with a dangerous weapon sentencing enhancement. In return, the State agreed to drop the two counts of attempted murder. However, during Lopez Sanchez's plea hearing, the State indicated it intended to seek the mandatory minimum on each count.[1]

---

[1] Murder in the second degree is class "B" felony that carries a maximum penalty of incarceration of "not more than fifty years." Iowa Code § 707.3(2). An individual convicted of murder in the second degree typically is not eligible for parole "unless the person has served at least seven-tenths of the maximum term of the person's

The district court held a sentencing hearing on January 4, 2024. At the hearing, the district court heard extensive testimony from two psychologists—Drs. Tracy Thomas and Rosanna Jones-Thurman. Additionally, reports from Drs. Thomas and Jones-Thurman were admitted into evidence during the hearing. The district court also heard two victim impact statements, as well as a statement of allocution from Lopez Sanchez. At the conclusion of the hearing, the district court rejected the State's request to impose mandatory minimums on each count.

Instead, the district court imposed an indeterminate fifty-year sentence for Lopez Sanchez's conviction for second degree murder and two indeterminate ten-year sentences for his dual convictions for willful injury causing serious injuries. Each of these sentences were ordered to run consecutively. Because the district court did not impose any mandatory minimums, Lopez Sanchez was immediately eligible for parole. He now appeals.

## II.     Standard of Review

We review sentences imposed within the statutory limits for an abuse of discretion. *State v. Seats*, 865 N.W.2d 545, 552 (Iowa 2015). "[O]ur task on appeal is not to second guess the decision made by the district court, but to determine if it was unreasonable or based on untenable grounds." *State v. Formaro*, 638 N.W.2d 720, 725 (Iowa 2002). Sentencing decisions made by the district court within the statutory limits are cloaked with a strong presumption in

---

sentence." Iowa Code § 902.12(1)(a). Willful injury causing serious injury is a class "C" felony. Iowa Code § 708.4(1). A person convicted of a class "C" normally faces a maximum penalty of up to ten years of incarceration. Iowa Code § 902.9(1)(c). However, if a dangerous weapon sentencing enhancement is added, "the convicted person shall serve a minimum of five years of the sentence imposed by law." *Id.* § 902.7.

their favor. *State v. Fetner*, 959 N.W.2d 129, 134 (Iowa 2021). However, when a juvenile offender is given an adult sentence, we "cannot merely rubber-stamp the [district] court's sentencing decision." *State v. Roby*, 897 N.W.2d 127, 138 (Iowa 2017) (citation omitted). In the context of imposing an adult sentence on a juvenile defendant, even a discretionary sentence may amount to an abuse of discretion if the district court

> fails to consider a relevant factor that should have received significant weight, gives significant weight to an improper or irrelevant factor, or considers only appropriate factors but nevertheless commits a clear error of judgment by arriving at a sentence that lies outside the limited range of choice dictated by the facts of the case.

*Id.* (citation omitted). But if the evidence supports the sentence, the district court did not commit an abuse of discretion. *State v. Guise*, 921 N.W.2d 26, 30 (Iowa 2018).[2]

### III.     Analysis

On appeal, Lopez Sanchez contends the district court abused its discretion by imposing consecutive sentences because the district "failed to carefully consider" mitigating factors related to his status as a juvenile offender. Additionally, he asserts the district court erred by not finding circumstances related to his status as a juvenile offender to be mitigating. We disagree on both points. For clarity and simplicity we analyze each argument separately.

---

[2] Because Lopez Sanchez challenges his sentence that was neither agreed-upon nor mandatory, we find he has established good cause for this appeal. *See State v. Damme*, 944 N.W.2d 98, 105 (Iowa 2020) (holding a defendant can establish good cause by challenging a sentence that is neither mandatory nor agreed-upon as part of their plea agreement).

*1. Consideration of Lyle Factors and Consecutive Sentences*

We begin our analysis by noting Iowa law recognizes special protections for juvenile offenders before they are given certain adult sentences. For example, prior to the imposition of a mandatory minimum sentence on a juvenile offender, the district court must hold an individualized sentencing hearing when the State signals it intends to request such a sentence. *State v. Lyle*, 854 N.W.2d 378, 404 (Iowa 2014). Our supreme court has emphasized that during the individualized hearing, the district court must consider "youth and its attendant circumstances" as potential mitigating factors. *Id.* The relevant factors for the district court's consideration are:

> (1) the age of the offender and the features of youthful behavior, such as "immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) the particular "family and home environment" that surround the youth; (3) the circumstances of the particular crime and all circumstances relating to youth that may have played a role in the commission of the crime; (4) the challenges for youthful offenders in navigating through the criminal process; and (5) the possibility of rehabilitation and the capacity for change.

*Id.* n.10 (quoting *United States v. Miller*, 567 U.S. 460, 477–78 (2012)). However, the district court need not hold an individualized sentencing hearing to consider the *Lyle* factors when the juvenile offender is not subject to a mandatory minimum sentence. *State v. Propps*, 897 N.W.2d 91, 104 (Iowa 2017).

Because the State requested the imposition of a mandatory minimum sentence on each count, the district court was required to hold an individualized sentencing hearing to consider the *Lyle* factors. *See Lyle*, 854 N.W.2d at 404. The district court conducted such a hearing and declined to impose any mandatory

minimum sentences.  In reaching its decision not to impose a mandatory minimum sentence, the district court extensively analyzed and discussed the *Lyle* factors.

In analyzing the first *Lyle* factor, the district court stated:

The first factor is the juvenile's age and features of youth, immaturity, impetuosity, and failure to appreciate consequences.
The Court must determine whether or not the defendant has more or less maturity, deliberation of thought, and appreciation of risk taking than normally exhibited by other juveniles.  Age is one issue.  Although, the Court, in prior case law, does not, I guess, discount the use of stating: Well, he's 17.  He's older.  So therefore, that's not mitigating.  That's not what the case law indicates.  Instead it's one of two main factors.
In this case, we did have a 17-year-old.  I think, as Dr. Thomas indicated, he did do intelligence testing.  He had no cognitive impairment.  She found him relatively sophisticated.  And Dr. Thurman found he had a general ability to understand, but had a history of impulsive decisions.
Looking at both of their testimony and all the evidence presented in this case, essentially, compared to other 17-year-olds or other teenagers, juveniles, he's average.  And so the Court finds this to be mitigated more neutral in this particular case.

As for the second *Lyle* factor, the district court stated:

With regard to the second factor, the home and family environment.  The court needs to identify a familiar dependency and negative influences of family circumstances.  That's what the Court should be looking at.  In this particular case, Mr. Lopez had a good home.  He had a good childhood.  His ACE score was zero which is remarkable.
There was some information provided by Dr. Thurman regarding some things that occurred while he was in the home.  There was an allegation that there was a drive-by shooting, and maybe a brother might have assaulted a parent.  But overall, I think both experts and all the evidence we have is that Mr. Lopez has a supportive and loving home.  And the Court finds that is not a mitigating factor in this particular case.

Moving on to the third *Lyle* factor, the district court added:

The third factor is the circumstances of the crime.  And the Court must look at Mr. Lopez's actual role and the role of external pressure.  There was concern by Dr. Thomas that Mr. Lopez minimized his involvement.  The Court looked at several different cases in the past that analyzed this issue.

Certainly, Mr. Lopez did not act alone. There is some evidence he may have been one of the instigators, but I don't think that is crystal clear as far as his involvement. He was not a shooter. There is evidence he might have provided a gun. He certainly hid the guns after—or at least he was found to possess the guns, at least three of them, after the shooting occurred.

Cases like this are often murky in the details when you have so many people involved, and it's such a chaotic situation. The Court finds this factor neutral.

In considering the fourth *Lyle* factor, the district court provided:

The fourth factor, which is legal competency and whether he's more capable than most to navigate the legal system.

He has no mental health history. He has no intellectual problems. He has no personality issues. Again, these issues often are difficult to determine. As the Court has stated—the Supreme Court—the relevance of this factor ultimately relates to the general population that youthful offenders are less able to confront the legal process. Whether a particular youth would be more capable than most would normally be a matter for expert testimony. This case, there was no evidence he's more capable than most, just that he is— basically doesn't have any major issues. The Court finds this potentially neutral.

As for the final *Lyle* factor, the district court said:

The fifth factor is the possibility of rehabilitation. Is he amenable to treatment? We noted he was on probation for willful injury and harassment in the first-degree, and he was placed on probation three months before this shooting occurred. While waiting in jail, he committed an assault, pled guilty, was found guilty beyond a reasonable doubt of assaulting an inmate. Dr. Thomas testified she thought he was not amendable to treatment. That it was a low—he scored low on her test. He had low motivation.

It is important to note that he indicated to Dr. Thurman that he is open to change. It is concerning on the SAVRY test that Mr. Lopez was high in all categories. It is important to note that Dr. Thomas thought he was able to appreciate risk, but wasn't particularly moved by that risk. So the Court finds that evidence not mitigating.

As the district court rejected imposing any mandatory minimum sentences, Lopez Sanchez does not challenge the district court's analysis of the *Lyle* factors in connection with that determination. Instead, he contends the district court failed

to carefully consider the *Lyle* factors in reaching the decision to impose consecutive sentences. Even after rejecting the option of imposing a mandatory minimum sentence, the *Lyle* factors remain relevant considerations to arrive at an appropriate sentence for a juvenile offender. *See State v. Crooks*, 911 N.W.2d 153, 173 (Iowa 2018) ("Once the sentencing court declines to impose a minimum period of incarceration without parole, the *Miller/Lyle* factors remain relevant in considering the remaining sentencing options."). But the district court is not required to reapply and reexamine the *Lyle* factors on the record in considering the remaining sentencing options after declining to impose a mandatory minimum sentence. *See id.* (noting there is no requirement that the district court reexamine and reapply the *Lyle* factors on the record after it rejects a mandatory minimum sentence).

We believe Lopez Sanchez's argument overlooks the fact that—immediately after thoroughly discussing the *Lyle* factors—the district court stated, "[b]esides the issue of mandatory minimums, the Court must determine whether or not this defendant's suspended sentence should be imposed, and whether or not the sentences should be run concurrently or consecutively." Importantly, this statement was made prior to the district court's rejection of the mandatory minimum sentences. From this statement, we believe it is clear the *Lyle* factors were a part of the district court's decision-making process in determining to run Lopez Sanchez's sentences consecutively.

Because the sentence imposed was within the statutory limits and supported by the evidence, we cannot conclude the district court abused its discretion on this ground. *See State v. Majors*, 940 N.W.2d 372, 387 (Iowa 2020)

(noting appellate courts are to affirm a sentence within the statutory limits and supported by the evidence).

### 2. Mitigating Nature of Lyle Factors

Lopez Sanchez also takes issue with the district court's treatment of the *Lyle* factors. He claims the district court erred by not finding any of the *Lyle* factors to be mitigating. He claims that, under Iowa law, the district court *must* find the *Lyle* factors to be mitigating. We disagree. For the sake of this argument, we assume the district court's thorough discussion of the *Lyle* factors were a part of its decision to run his sentences consecutively.

We believe Lopez Sanchez misreads our supreme court's case law discussing the analysis of the *Lyle* factors. In *State v. Pearson*, our supreme court stated, "[T]he typical characteristics of youth, such as immaturity, impetuosity, and poor risk assessment, are to be regarded as mitigating instead of aggravating factors." *State v. Pearson*, 836 N.W.2d 88, 95 (Iowa 2013). However, we do not believe this statement means that the district court is specifically required to find each of the *Lyle* factors to be mitigating. Such a blanket requirement would be incompatible with the goal of utilizing the *Lyle* factors, which is to conduct an *individualized* assessment of a juvenile offender to aid in reaching an appropriate sentence.

Additionally, our supreme court has previously upheld a juvenile offender's sentence after the district court explicitly found several *Lyle* factors to not be mitigating because the evidence supported such a finding. *See Majors*, 940 N.W.2d at 388-89 (affirming a juvenile offender's sentence because the evidence supported the district court's determination that four of the five *Lyle* factors were

not mitigating).  Here, the evidence fully supports the district court's determination that *Lyle* factors were not mitigating in this case.

The district court heard extensive testimony from two psychologists—Drs. Thomas and Jones-Thurman—regarding the *Lyle* factors.  Drs. Thomas and Jones-Thurman gave conflicting testimony on the application of the *Lyle* factors.  However, we note the district court expressly found Dr. Thomas's testimony to be more credible.  And we see no reason to upend the district court's credibility finding.  *State v. Jacobs*, 607 N.W.2d 679, 685 (Iowa 2000) (noting that when conflicting expert testimony is presented, appellate courts should defer to the fact-finder's determinations regarding expert witness credibility).  Regarding the first *Lyle* factor—the age of the offender and features of youthful behavior—Dr. Thomas testified that Lopez Sanchez had "good cognitive skills," was "able to think through decisions," and possessed a "high level of sophistication."  However, the district court also noted there was evidence Lopez Sanchez struggled with impulsive decision-making.  This evidence more than supports the district court's determination that this factor was "neutral."

As for the second factor, the family and home environment of the juvenile, Dr. Thomas testified that Lopez Sanchez "reported a fairly good childhood."  She added, "he denied abuse, neglect.  Denied any involvement of DHS in the home."  She concluded her thoughts on this factor by stating, "there were no family factors that to me were relevant to his criminal behavior or would explain in some way that behavior."  We find such evidence supports the district court's finding that this factor was not mitigating.

Moving on to the circumstances of the particular crime and all circumstances relating to youth that may have played a role in the commission of the crime, Dr. Thomas testified that, "[i]n terms of peer pressure, when I look at the results of testing and his past behavior, there's no indication that he's the type of person who would be susceptible to peer pressure." When considering this factor in the context of group crimes, external pressure on the juvenile offender is a relevant consideration. *See Majors*, 940 N.W.2d at 389 (noting with group crimes, courts should consider numerous types of external pressure). The district court also is to consider the defendant's actual role in the crime. *See id.* The district court noted that Lopez Sanchez was not a shooter. But there is no dispute that he was a driver of one of the vehicles involved in the shooting. Additionally, the district court noted that he likely hid some of the weapons used in the shooting. The evidence shows three nine-millimeter handguns were found in his bedroom following a search of his residence. However, the district court noted it was not evident what Lopez Sanchez's precise role in planning the crime was. We believe the evidence supports the district court's determination that this factor was "neutral."

Under the fourth factor, the district court was to consider challenges for youthful offenders in navigating the criminal process. Dr. Thomas testified that Lopez Sanchez "is not intellectually disabled, cognitively impaired. He doesn't have personality or mental health problems that would put him at a particular disadvantage in the court system." She concluded her testimony on this factor by stating, "bottom line, I did not note any particular incapacities that would have been

detrimental in the legal system." This evidence supports the district court's determination that this factor was "neutral."

Finally, regarding the fifth factor—the possibility of rehabilitation and the capacity for change—Dr. Thomas testified as follows:

> His treatment amenability is low. And this involved several factors. Treatment amenability looks at or incorporates both how difficult would treatment be based on the things that need to be changed, and also how motivated or willing is the individual to change.
> It would also incorporate are there any barriers. That would be things like cognitive or intellectual deficits. So in terms of the things that need to be changed, the core thing for Mr. Lopez is his criminal thinking styles, his antisocial attitudes, his pervasive long-term history of being resistant to authority, engaging in violent behavior, despite attempts to intervene. That's very difficult to treat.
> And then looking at his motivation. That's low. And this goes back to his minimizing his involvement, not accepting responsibility. Individuals who don't accept responsibility or blame external factors for their behavior aren't typically motivated to engage in treatment because they don't believe its them.

The district court noted that, while in jail pending sentencing, Lopez Sanchez committed another violent offense. And this may be properly considered in assessing a juvenile's chances for rehabilitation. *See Majors*, 940 N.W.2d at 390 (noting the district court properly considered the juvenile's prior disciplinary violations in prison in assessing his chances for rehabilitation). The evidence supports the district court's conclusion that this factor was not mitigating.

Because we find evidence supports the district court's determinations concerning the *Lyle* factors, we cannot conclude it abused its discretion on this ground.

**IV.** **Conclusion**

Finding the district court did not abuse its discretion in imposing consecutive sentences, we affirm.

**AFFIRMED.**